## McALESTER GAS & COKE CO. v. CORPORATION COMMISSION et al.

No. 15162—Opinion Filed May 20, 1924.

(Syllabus.)

1. **Corporation Commission—Appeals from Orders—Remand for Further Evidence.**

Under section 22, art. 9, of the Constitution of Oklahoma, this court, when it deems necessary in the interest of justice, may remand an appeal from an order of the Corporation Commission for the taking of further testimony to be reported upon to the court, together with certificate of such additional evidence.

2. **Same—Appeal—Power of Supreme Court to Make Temporary Substitute Orders.**

By the provisions of section 23, art. 9. Constitution of Oklahoma, this court upon appeal may substitute for the order of the commission such order as, in its opinion, the commission should have made at the time of entering the order appealed from. This relates to temporary orders as well as final orders, and where the record is in a condition that a final order cannot be made, this court will make such temporary order as, in its opinion, should have been made at the time the appeal was taken.

3. **Same—Making of Temporary Rates—Suspending Bond to Insure Refunds.**

Under the authority of section 21 and section 23, art. 9, Constitution of Oklahoma, upon the making of a temporary rate, superseding or suspending an order of the Corpor-

ation Commission, this court may require a suspending bond, in a proper sum to be fixed by the court, to insure the refunding of any sums improperly collected under such rate to the persons entitled thereto.

**4    Same—"Present Fair Value of Public Utility"—Rule for Determination.**

In determining the present fair value of the property of a public utility, neither original cost nor reproduction cost new, considered separately, are determinative, but consideration should be given to both original cost and present reproduction cost, less depreciation, together with all the other facts and circumstances which would have a bearing upon the value of the property, and from a consideration of all these a fair present value is to be determined. Oklahoma Natural Gas Co. v. Corporation Commission, 90 Okla. 84, 216 Pac. 917.

**5.    Same—Items for Consideration.**

The items of going concern value, engineering and superintendence during construction, working capital and law expenditures during construction are proper items for consideration in the determination of the present value of an operating public utility.

**6.    Same.**

The items of injuries during construction and miscellaneous expenditures during construction may be proper items for consideration in the determination of the fair value of a public utility, and should be included in the valuation where the testimony warrants.

**7.    Same—Separation of Items.**

In determining the value of a public utility the items set out in the two preceding syllabi should, where at all possible, be separately valued and in specific amounts.

Appeal by the McAlester Gas & Coke Company from an order of the Corporation Commission denying its application for an increase in gas rates. Order entered fixing temporary rate, and cause remanded, with directions to take further testimony.

Busby, Sparrow & Patterson and Snyder, Owen & Lybrand, for plaintiff in error.

W. J. Horton and E .S. Ratliff, for defendant in error.

WARREN, J. On October 4, 1921, the plaintiff in error, the McAlester Gas & Coke Company, filed an application with the Corporation Commission of the state of Oklahoma praying an increase of rates for gas furnished by it to its patrons in the city of McAlester and adjacent thereto.

The petitioner states that it was operating on a sliding scale or schedule of rates set out in petition as follows:

First 200,000 cu. ft. in one month    .44444
Next 300,000 cu. ft. in one month .35555
Next 500,000 cu. ft. in one month .31111
Next 1,000,000 cu. ft. in one month .26666
All over _____.15555

Subject to a discount of 10% if promptly paid.

It was alleged by the company in its petition that it is in the heart of a large coal producing section; that coal could be procured at a very low rate because of its accessibility and that it was losing its industrial patrons on that account, and, therefore, could not increase rates for industrial concerns. It cited instances of the State Penitentiary and the Choctaw Light & Power Company, a street railway and interurban railway operating company. It was alleged that the reasonable value of the property of the company was $800,000 and that the earnings of the company were rapidly decreasing, being $75,000 less in 1921 than in 1920. and that its receipts were inadequate to return a sufficient income on the fair value of its property; that if present rates were continued it would result in a confiscation of its property and would result in taking its property for public use without just compensation.

The company further alleges that its sole source of supply for natural gas is the Quinton gas field, which it alleges is rapidly becoming exhausted and has a prospective life of about five to seven years.

The prayer is for a complete investigation, valuation, estimation of expense and income, and for an order increasing rates.

To the petition of the company a response was filed by the city of McAlester in its own behalf and on behalf of its gas consuming inhabitants, denying the allegations of the company's petition and alleging an excessive valuation upon the property of the company, reciting a previous order of the commission, being No. 1507, establishing a valuation of $358,224.08, alleging no material increase in valuation, and further alleging that petitioner's earnings have already been sufficient to pay a reasonable return and to amortize its actual investment. The city further alleges that the present rates are excessive because based upon an excessive valuation, and, further, because based on the assumption that the company was to pay 9c per 1,000 cu. ft. for raw gas at the well. while, in fact, it has only paid 6c per 1,000 cu. ft.

This was set for hearing by the commis-

sion and testimony taken October 24 to 27, 1921, January 19 to 21, 1922, and February 2, 1922, which was apparently the last hearing at which testimony was taken with all parties present and witnesses produced with opportunity for cross-examination.

Subsequent to the order of the commission on this application the matters involved therein have been before this court; the first being the case of the Quinton Relief Oil & Gas Company v. Corporation Commission et al., 101 Okla. 164, 224 Pac. 156, opinion handed down February 19, 1924, and the second being McAlester Gas & Coke Company v. Corporation Commission et al., No. 15162, handed down March 11, 1924, 101 Okla. 268, 224 Pac. 698. The former case is pertinent in that it in some measure reflects the condition of the Quinton gas field, the source of supply of the plaintiff in error. The latter case was an application for a supersedeas in the present case wherein the plaintiff in error alleged the application for the increase in rates, the hearings, the various delays, the lapse of time between the hearing and the final order, approximately two years, betterments in a substantial sum, and other pertinent matters in this application for a supersedeas. The plaintiff in error asked for an order of this court permitting it to put in temporary rates as shown by the following scale: .

### Summer Months

May, June, Jul., Aug., Sept. Oct.

|        |       |   | Gross | Net |
|--------|-------|---|-------|-----|
| First  | 1 M   |   | 1.112 | 1.00 |
| Next   | 24 M  |   | .723  | .65 |
| Next   | 150 M |   | .389  | .35 |
| Next   | 325 M |   | .356  | .32 |
| Next   | 500 M |   | .312  | .28 |
| Next   | 1000 M |  | .267  | .24 |
| All over | 2000 M | | .156  | .14 |

### Winter Months

Nov., Dec., Jan., Feb., Mar., April

|        |       | Gross | Net |
|--------|-------|-------|-----|
| First  | 50 M  | .612  | 55 |
| Next   | 150 M | .445  | 40 |
| Next   | 800 M | .312  | 27 |
| Next   | 1000 M | .267 | 24 |
| All over 2000 @ | | .156 | 14 |

Above net rates to be charged on bills paid within 10 days.

Above gross rates to be charged on bills paid after 10 days.

Provided that the rate, net for all gas, shall not be less than 15c per M.

This application for a supersedeas and temporary order was duly submitted to this court and passed upon, disallowing the application, but taking such action assuring a speedy hearing that a supersedeas was not deemed necessary.

The record in this case is very voluminous and has been carefully examined. In view of the wide differences of opinion on the various matters it was necessary for this court to study carefully the entire testimony to try to determine whether it was possible at this time to make a final determination of the case.

This property consists mainly of a natural and an artificial gas plant at McAlester, and small plants at Quinton, Blocker, and Featherston. Another large item in the valuation is a main supply line from the Quinton gas field for the transportation of gas to McAlester and the smaller towns.

There have been at least three complete physical valuations of this property and one partial one. The first was by Hagenah & Erickson, of Chicago, Ill., in 1919, based on a replacement value, showing, less depreciation, an actual value of $854,554. The second was by Durham & McKinney Eng. & Const. Co., of Oklahoma City, November 9, 1920, which was based on the original cost method, showing a valuation of $604,202.40. The third was by Musson & Gayle, Eng'rs, of Oklahoma City, and showed a valuation of $712,796.59, and was made on a replacement basis. The partial valuation was made by J. W. Duval, an engineer, at the time employed by the Corporation Commission. There was also a finding by the Corporation Commission in 1918, pleaded by defendant in error, of a valuation of $358,224.08.

The inventory of Hagenah & Erickson, except as to total amount, was never placed in evidence, and there was further no showing made as to how the figures were reached. It was not considered by the commission and cannot be considered here. The Durham & McKinney inventory was in evidence in its entirety, but was considered unsatisfactory for many reasons, chiefly, we think, because based on original cost rather than replacement value. In any event, the reasons for disregarding it are immaterial now. The inventory made by J. W. Duval was never completed and never placed in evidence. His methods in arriving at his figures were not revealed. It appears that he left the employ of the commission and his notes went with him. They were secured after the case was closed by the commission and afford the

basis for much unprofitable disputation, but cannot enter into our consideration. The Musson & Gayle inventory was made as of December 15, 1921, subsequent to the institution of this proceeding and prior to the closing of the testimony. It was introduced in evidence in its entirety, was secured and offered in evidence, and vouched for by the plaintiff in error, and apparently accepted by the commission "as a basis". It appears that H. E. Musson, the member of the firm who made the inventory, was for four years in the employ of the Corporation Commission, leaving its employ in 1917, and during that period he was in charge of the Gas, Telephone & Electric Department. It further appears that he appraised properties of other utilities for the commission for five months in 1921. His appraisement was made on the basis of replacement costs, which apparently in the opinion of the commission and of the company was the most satisfactory way to arrive at the value for rate making purposes.

In Oklahoma Natural Gas Co. v. Corporation Commission, 90 Okla. 84, 216 Pac. 917, this court said:

"In determining the present fair value of the property of a public utility, neither original cost nor reproduction cost new, considered separately, are determinative, but consideration should be given to both original cost and present reproduction cost, less depreciation, together with all other facts and circumstances which would have a bearing upon the value of the property, and from a consideration of all these a fair present value is to be determined."

The rule, as set out in the above syllabus, has been generally approved by the courts of the various states, also by the Supreme Court of the United States, and fixes a better rule for determining value than by the confining of the testimony to replacement, less depreciation, or the original cost value alone.

In the case of the Pioneer Telephone & Telegraph Co. v. Westenhaver et al., 29 Okla. 429, 118 Pac. 354, this court held:

"When the present value of a telephone exchange plant is being ascertained for the purpose of determining what amount the company is entitled to earn as a fair return upon its investment, and such value is as-certained by determining what amount it would cost to reproduce the plant, a reasonable amount for interest on the capital invested in the properties of the plant during period of construction should be allow-ed."

We are, therefore, confined to the inven-tory of Musson & Gayle and it only will be considered in this opinion.

The commission, while accepting the inventory of Musson & Gayle, did so only "as a basis" and departed therefrom whenever the particular item or conclusion did not appeal to it. The total valuation, according to Musson & Gayle, was $712,796.58. This included engineering and superintendence, $24,968.81; law expenditures during construction, $4,993.76; injuries during construction, $8,789.02; interest during construction, $46,434.13; miscellaneous construction expenditures, $14,981.30. These amounts total $100,167.02. The above figures were the new replacement values and they were found by the engineers to have a depreciated value of 82.72 per cent., leaving a value as of December 15, 1921, of $589,-643.25. This was as shown by the inventory. Mr. H. E. Musson, the man who made the actual appraisement, testified in the case and according to his testimony a working capital equivalent to six weeks' operating expense of $33,484.74 was necessary to be maintained continuously in conduct of the business of the concern. He also testifies that there is an actual value to a live business, having an actual list of customers with a revenue greater than its operating expenses. He places this valuation in this class of business at 15% of the physical valuation of the property, or $88,446.48. Adding to his depreciated appraisement of $589,-643.25, the $33,484.74 working capital and $88,446.48 going concern valuation, we have his estimate of $711,574.47 as the value which must be taken in figuring such rate as will produce a fair return to the investors as well as produce a sufficient sum to care for depreciation and amortize the property at the end of its prospective life, less any salvage value remaining.

The commission, taking this inventory as a basis, discarded the items of engineering and superintendence, law expenditures during construction, injuries during construction, interest during construction, and miscellaneous construction expenditures aggregating $84,276.68. In lieu of these items the commission has allowed a lump sum of 20% on the remainder after subtracting the said sum of $84,276.68. This 20% allowance is also required to cover the items of working capital and going concern values. The commission also refuses to make any allowance for the artificial gas plant included in the inventory and valued therein at $48,321.24.

There are other differences between the parties hereto which will be mentioned for

further direction in this opinion, but which we feel cannot now be adjudicated. They refer entirely to matters never put in evidence in any of the hearings before the commission. It will be remembered that two years elapsed between the closing of the case by both the litigants and the issuing of the order on which this appeal is based. During that time and up to September 30, 1923, the company contends, that betterments were added to the property in the aggregate sum of $96,-744.61, which, they vigorously affirm in their brief, were purchased with money other than the general receipts from gas sales. They further state that they have been at the additional expense of installing a compressor, being a special plant for the purpose of bringing gas from the field to the city. They state the pressure of gas at the field can no longer force it through the pipes in sufficient quantities to supply the town and this is the only means by which a supply can be made available. This compressor is estimated to cost about $20,000, of which only $8,000 was included in the foregoing estimate.

The commission in its order insists that the only additions to the property are those purchased with cash receipts from gas sales, for which the company is not entitled to a return. It fails to notice the item of expense for a compressor and prospective loss of custom, but calls attention and largely bases its order on annual reports alleged to have been filed with the commission showing operations, receipts, and expenses in part since the hearings were closed. The commission in its order finds that the sum of $218,798.92 has been set aside by the company in the four years ending December 30, 1922. The company says the reports do not reveal the true condition and that not one penny of the sums claimed are in the company treasury or have been received by it. No testimony was introduced at any of the hearings with reference to these latter controverted questions, and it is obvious that no findings can be based thereon or rates fixed on such findings.

It is apparent, therefore, that no final order can be made in this case as at this time presented to the court. We cannot be supposed to speculate in the absence of testimony on what has happened since the case was closed. We can, however, pass upon the controverted matters as presented by the testimony and the order thereon, order a temporary rate to cover the case as far as it has developed, and direct the taking of further testimony on matters developing since the hearing, and the making of the final order thereon when such testimony is completed.

What, then, are the controverted matters presented by the testimony covered by the hearing on which we can at this time pass? They are: First. Was the commission justified in subtracting from the Musson & Gayle inventory the sum of $48,321.24 representing the artificial gas plant? This plant was acquired by the predecessor of the present company at a time when natural gas was not available and the product of this plant was the only gas product at McAlester. It became necessary to protect its business on the development of natural gas to procure a natural gas franchise and to change its business from an artificial to a natural gas basis. The new franchise required the company, under section 3 of its ordinance, to have available when necessary a sufficient supply of artificial gas if the natural gas should fail, and the maintenance of this artificial gas plant was certainly within the provisions of the franchise. The company can maintain this so long as it is compelled to comply with the provisions of the franchise. If this item was not used and necessary as an adjunct to the plant, it would be necessary to amortize it with an added rate for that purpose. Aside from this consideration we are of the opinion that the testimony abundantly shows that this property or a major part thereof is used and useful in supplying the inhabitants of McAlester with natural gas. Section 22, art. 9, of the Constitution of Oklahoma, provides that the "action of the commission appealed from shall be regarded as prima facie just, reasonable and correct," and the finding of the commission is given that presumption here, but a prima facie presumption is not more binding on this court than a finding of a court of equity, and this court will weigh the testimony on which such order is based, and if such order is not supported by the weight of the testimony, it will be set aside. The value of the artificial gas plant will, therefore, be included in the consideration of the final order.

Second. The next major difference to be noticed is upon the allowance of a lump sum of 20% by the commission to cover engineering and superintendence, law expenditures during construction, injuries during construction, interest during construction, and miscellaneous construction expenditures. Under the Musson & Gayle inventory and by his testimony they aggregate a net sum of $84,-276.68. This would constitute about 15% of

the bare physical value, as shown by Musson & Gayle, leaving only about 5% remaining to cover the working capital and going concern items. The witness, H. E. Musson, testified to $33,484.74 for working capital, which would amount to about 6% of the physical value, not being sufficient for this item and leaving nothing for going concern. Mr. Musson testified that the going concern value of this plant was 15% and there was nothing introduced to the contrary. The commission argues in its brief that a practical monopoly is not entitled to a going concern allowance. It argues that natural gas is such a desirable commodity that the moment a pipe is laid in the earth and a supply secured patrons rush to secure its benefits. This is true to some extent, but the business of a gas company may be fostered and increased to a large extent. This is shown in this record when efforts have been made to secure and keep large customers like the penitentiary and the street car company. Patrons may be taught other uses for the product. Coal users for power and other purposes may be induced to use gas when the benefits of cleanliness, health, and economy are properly placed before them. It is said nobody loves a public utility, yet prompt attention to complaints, courteous and fair treatment will add to the business of any business, and consequently to its going concern value. This court has held in the case of Pioneer Telephone & Telegraph Company v. Westenhaver, 29 Okla. 429, 118 Pac. 354, as follows:

"In ascertaining the present value of said plant for the purpose of fixing rates that shall be charged for services thereon, the Corporation Commission should not confine its consideration to their valuation of the bare physical plant, where such exchange has a large patronage sufficient to pay operating expenses, fixed charges, and some profits, when such patronage has been built up by expenditure of labor and money for a period of time during which the plant was operated at a loss, but these facts should be considered, and a reasonable amount allowed for its earning capacity as a going concern."

In the same case the court held that interest during construction was a matter properly included in the present value of a plant. Engineering costs and legal expenditures during construction are also properly a part of the actual value of a plant. It could not be constructed without them and they are as necessary and as much a part of the cost and value of the plant as the labor that was used in laying the pipes or constructing the building.

Injuries during construction and miscellaneous construction expenditures may or may not be proper. Apparently it would not be difficult to ascertain from the records of the company the exact amount of the former if such exists, and an approximately correct estimate of the latter.

The commission has disallowed all of these items as concretely set out and has allowed in lieu thereof 20% on the physical value of the plant. They announce this as a settled policy in all cases, followed through the past few years. As a policy laying down a hard and fast rule for all cases this cannot be approved. It was approved in the specific case of the Okmulgee Gas Company v. Corporation Commission, 95 Okla. 213, 220 Pac. 28, and under the showing made in that case was correct. The testimony in this case as before this court at this time justifies a higher rate. The better method is not to fix an arbitrary sum and hold it to cover all intangibles, but to take the testimony and allot a proper amount to each item. The aggregate may be 20% or a larger or lesser amount, but it is apparent that there may be differences in the various amounts in different kinds of public utilities and even a considerable variance in those of the same class. For this reason the commission is directed, when further hearing is had in this case, to take testimony upon all the various items of intangibles and allot to each item such an amount as in its opinion the testimony justifies. See Utilities Com. ex rel. City of Springfield v. Springfield Gas & Electric Company, 291 Ill. 209.

The testimony in this cause, as produced by the appellant upon the questions of depreciation and amortization, authorizes an allowance of 17% upon the net value for those purposes, also 8% on such valuation for return to the owners. There was no testimony to the contrary. There was a controversy and a serious one as to the life of the Quinton field. The testimony of the appellant, as produced more than two years ago, showed a prospective life of the Quinton field of from two to three years. That of the appellee showed a life at that time of five years. All the testimony showed that the field was in a serious condition. There were approximately 20 wells in a circumscribed area of about 700 acres, the rock pressure in the field indicating the density of the gas had fallen from an original pressure indicating large quantities of gas to a very small amount. This decrease had been accelerated to a large degree by the large quantities of gas sold by the Quinton Relief Oil & Gas

Company for the purpose of manufacturing carbon black, previously referred to herein as Quinton Relief Oil & Gas Company v. Corporation Commission. There is absolutely no testimony indicating an extended life to this field. When this field is exhausted the main pipe lines to the city of McAlester, aggregating about 45%, of the physical valuation, will be worthless, except for junk. The lines will have to be dug up and transported from their beds, largely in a rough country, to a railroad point for a market. Were the amounts already collected by the company, now in dispute, as alleged by the company not to exist, we would be constrained to allow the full requested amortization rate. It would appear, in view of the showing as to this field, that 17% for amortization and depreciation is not excessive. McAlester, as is well known, is not accessible to any other gas field yet proven. The possibility of a further supply in the direction followed by this pipe line is remote. In our view the placing of money in a natural gas plant under such circumstances is a very precarious investment. This company has made every effort to conserve this gas for the people of McAlester, as shown by the litigation in this court, and it should not be strangled by refusing to allow adequate rates. We are not deciding here and now what is an adequate rate, for this cannot be done under the record, but under the showing as made will order a temporary rate to be put into effect pending further findings by the commission under testimony to be taken under the direction of this opinion. This additional testimony, of course, may show that the allowances for going concern, working capital, interest, engineering and law expenditures during construction, are excessive and other expenditures improper. This they must have the opportunity to do.

On the basis of a value of $711,574.47, as shown by the Musson & Gayle inventory, exhibits and testimony on a basis of 8% returned to owners, and 5% depreciation and 5% amortization the company would be entitled to earn $128,083.39. Estimating the return on domestic gas at an increase of 15 cents per M with the same amount sold as in 1921, the increase in revenue would amount to $41,134.05. An increase of 20 cents in the domestic gas under the same conditions would produce an additional revenue of $54,845.40. The company has asked for the rate as set out in the application for a supersedeas as a temporary rate. This rate creates a summer rate and a winter rate, which the commission, or this court, has undoubtedly the power to make, but its present feasibility is not shown. It would have somewhat the effect of fixing a minimum rate for small users during the summer, and there is no testimony as to what it will produce. We are inclined to adhere to the facts as shown and follow the past plan of a uniform rate for summer and winter until changed by the commission under competent testimony, or in a proper case here on appeal where this particular proposition is presented.

Figuring again on the 1921 basis with the actual earnings for that year at $84,597.66, adding $54,845.40 for the additional return at an increase in the domestic gas of 20 cents per M, we have a prospective earning of $139,443.06. Allowing 8% for return to owners, being $56,925.95, depreciation 5%, being $35,578.72, and subtracting these from the probable earnings; we have a balance for amortization of $46,938.36. This is approximately 6% on the total valuation as estimated by Musson & Gayle. This is not as much as is justified by the testimony as to the condition of the Quinton field and the probable life of the main line, if not the entire plant; but in view of the matters that have crept into the case, it is the extent that will be allowed for this temporary rate. There will be inducement for both parties to expedite the hearing and get this case in a condition where a final order may be made.

The matter not now being finally adjudicated, however, and the company in its application for a supersedeas having voluntarily offered to give bond for the amounts charged in excess of the present rates or impound the said excess in such institution as the court or commission may designate, it is ordered that a flat increase of 20 cents per M on domestic gas is hereby put in effect as a temporary rate, making the gross rate on the first item of the present scale .6666. It is further ordered that the appellant make and file a sufficient bond as provided by section 22, art. 9, Constitution of Oklahoma, payable to the estate to be approved by the court in the sum of $25,000 conditioned for the repayment to the persons entitled thereto of the excess charges over existing rates or the excess of such charges over such rate as may be finally fixed by this court.

It is further ordered that the additional investigation herein ordered be completed on or before September 1, 1924, and that evi-

dence be taken on the following matters as hereinbefore set out:

1st. What is the proper amount to allow for the various items of going concern, engineering and superintendence, working capital, interest during construction, each item to be estimated separately?

2nd. What amount, if any, should be allowed for injuries during construction and miscellaneous construction expenditures, separately estimated?

3rd. What amount has been expended by the company for betterments since February 4, 1922, and what was the source of the funds for their payments?

4th. Has the company been able to set aside, as found by the order of the commission, the sum of $218,798.92 or any other substantial sum for depreciation and amortization?

5th. If not, how were the figures secured upon which reports were based showing such amounts.

6th. If so, what has become of the money.

7th. What have been the receipts and expenditures since the closing of the hearing in February, 1922?

8th. The present condition of the Quinton gas field?

9th. Any other facts the commission or either party desired considered, whether discussed in this opinion or not.

These items are required in order that this court can act with any degree of intelligence in making a rate. Conditions change so rapidly in a gas field, and the condition surrounding the business of the gas company may be so different after the period of two years, that the making of a rate now on conditions existing at that time would be mere speculation. The company has asked an increase merely on the domestic rate. The policy of a change in this rate only has not been challenged by the city of McAlester, nor has it been referred to in the commission's order. This feature, therefore, will be deemed as not in this controversy.

It is ordered, therefore, that this cause be remanded to the commission to take testimony as herein set out, and that it report the said testimony, together with its findings thereon, to this court on or before the said date of September 1, 1924. The company on the filing and approval of the bond herein specified is authorized to make the increase of 20 cents per M on the rate of domestic gas to its patrons, or .6666 item one

present schedule, said increase to continue until the further order of this court, not later, however, than September 1, 1924.

JOHNSON, C. J., and McNEILL, NICHOLSON, and LYDICK, JJ., concur. GORDON, J., not participating.

On Rehearing.

PER CURIAM. Due to the importance of the question involved here, we deem it necessary to render an opinion on rehearing.

It is provided in section 22, art. 9, of the state Constitution, that on appeal to this court from an order of the Corporation Commission, that tribunal shall certify to this court

"all facts upon which the action appealed from was based and which may be essential for the proper decision of the appeal."

Such record, of course, can contain only the evidence which was produced in the trial of the case before the Corporation Commission, for upon that alone must the decision of the Corporation Commission lawfully rest. In this case the Corporation Commission did certify such a record to us. On the Constitutions of the state and nation, on the law as enacted by the Legislature, and upon that record, and nothing more, must our decision rest. In our opinion of May 20th we held that, under the evidence in that record, it strongly appeared that the company was entitled to a substantial increase in its rates. However, we found that after taking the evidence in the case, the Corporation Commission held it under advisement for two years without action, and then rendered its decision upon a record which failed to portray conditions then existing, except in so far as the law may require a presumption that the conditions proven to exist continued so to do. It further appeared to us that there had been no sufficient effort made by the Corporation Commission during the trial before it to meet, by competent evidence, many of the material claims made by the company and strongly supported by its proof, but which we were inclined to fear were somewhat extravagant. The record was stale. For these reasons, we were unwilling to order a quasi permanent rate by our final decision at that time and upon that record. In order to insure the people of the City of McAlester of an opportunity to have their interests finally and fully protected, we made, for the information of the parties, a finding of the facts as shown by the record then before

us and remanded the case to the Corporation Commission to take further evidence and by which these tentative conclusions, if incorrect upon the real facts, might be overcome in a further hearing by competent evidence.

It is the law and the rule of this court in an appeal like this, and we so held in our opinion in this case filed March 13th, that where it strongly appears from an examination of the record before us that the company is entitled to a substantial increase in its rates, and where it further appears that there will be much delay in the final disposition of the case in this court, a temporary increase in rates will be allowed by proper order of this court. The Corporation Commission made no complaint and filed no petition for rehearing on that order, and the rule there announced has become effective as a rule for further procedure in this case. Because of the condition of the record further delay in this case is now inevitable. If, at the conclusion of this investigation, it should finally appear, as the record before us at the present time makes it appear, that the company is now operating its business at an unfairly low rate, then there will be no practical way for the company to reimburse itself for the loss in furnishing gas to its patrons between now and then. If, however, we put into effect now a temporary increase in rates and require the company to give a large and substantial bond conditioned that it will refund this increase in rates in the event we, upon the final record, decide such increase to be erroneous, then the patrons' interests will be amply protected by the refund. Under this plan no harm can come to the patrons if it be ultimately decided that the company was not entitled to the increase, while, on the other hand, the company would sustain an unjust loss if not given a temporary increase, if upon the final record it should appear that the company was entitled to a substantial increase during all this time. By permitting the temporary increase, under bond, no one can be ultimately injured, whatever the final decision may have to be. By our order we have required the Corporation Commission to complete the record by September 1st so that we may make our final order before the cold weather makes necessary a heavy consumption of natural gas. The temporary increase is limited by our order to the hot summer months, when the increase makes little difference in the bills.

The matter is now presented to us upon petition of the Corporation Commission for rehearing. In oral argument thereon before this court it is admitted by counsel for the Corporation Commission that many of the material findings of fact made by it and entered in its order are not supported by evidence. It appears that the commission based some of its orders upon oral reports made by one of its engineers who went to McAlester, reported back orally to some of the commission, and left without testifying in the case, and upon other reports of the company which were not produced in the evidence nor preserved in the record certified to us. It appears that no effort was made by the Corporation Commission to meet much other important evidence of the company in the trial, as the Corporation Commission was content to merely reject it. On the oral argument, counsel for city of McAlester complains to the court of the lack of aid and co-operation on the part of the Corporation Commission. In the oral argument many facts were suggested as existing which, if established, would be of the greatest importance for our consideration and against the proposed increase in rates. But in the oral argument our attention is called to little, if anything, showing any errors to have been made by us in our opinion of May 20th based upon the record before us. It is suggested that the opinion of the commission should be given a most liberal consideration by this court because of the fact that the members of the Corporation Commission are not lawyers and are not skilled as accountants, engineers, or otherwise in the business of the utility applying for the increase in rates. It is sufficient to say that the Legislature has been very liberal in its appropriations by which learned lawyers are employed to advise the commission upon matters of law and by which skilled and experienced accountants and engineers are furnished the commission sufficient to properly prepare a case of this kind. We are, therefore, of the opinion that the petition for rehearing must be denied.

At the same time there is presented to us an application by the company complaining that the Corporation Commission has made unjust orders directing it to furnish records and data for a further hearing in this case and which are wholly unnecessary and which orders the company claims were made willfully for the purpose of annoying and harassing the company. If the company feels thus aggrieved, it should first apply to the Corporation Commission for a modification of these orders, setting forth its reasons and proof in support thereof. This it

has not done, and the application should be denied.

Therefore, the petition for rehearing in this case upon the order of May 20th is denied and mandate thereon shall forthwith be transmitted to the Corporation Commission, and the company's application for modification of said orders relative to the production of books, records, and data is denied.

GORDON, J., disqualified and not participating.